# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| JOHN ANTHONY VUKAS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION NO. 09-0536-CG-N |
| JAMES LACKEY, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on defendant's motion for summary judgment (Doc. 18), plaintiff's opposition thereto (Doc. 21) and defendant's reply (Doc. 22). Because the court finds that defendant had arguable probable cause to arrest plaintiff, the court finds that the defendant is entitled to qualified immunity. Therefore, defendant's motion is due to be granted.

## FACTS

Plaintiff complains that he was arrested without probable cause on March 25, 2009, by the defendant, Sergeant James Lackey of the Mobile County Sheriff's Office.

According to plaintiff, on March 9 or 10, 2009, plaintiff was introduced for the first time to an individual named Madonna Barnhill by another friend of his named Leslie Scheniel. (Doc. 18-5, pp. 14, 16, 54). Barnhill told plaintiff that she needed "a little help" and plaintiff wrote her a check for $100. (Doc. 18-5, p. 16). After knowing Barnhill for only a few hours, plaintiff rented a room for Barnhill for that night at the Bayfront Inn and Suites in Mobile, Alabama.

1

(Doc. 18-5, pp. 14-15, 17-18, 19). They stayed in the room for about an hour and then Barnhill needed a ride, so plaintiff rented her a car for the day from Enterprise Car Rentals. (Doc. 18-5, pp. 14-15, 17). Plaintiff did not tell the rental company that he was renting it for Ms. Barnhill. (Doc. 18-5, pp. 30-31). After Barnhill got the car, plaintiff went home. (Doc. 18-5, p. 19). Barnhill was supposed to turn the car in the next afternoon. (Doc. 18-5, p. 18). Plaintiff called Enterprise the next day and was told that the car had not been returned. (Doc. 18-5, p. 20). Plaintiff went back to the motel, but Barnhill was not there. (Doc. 18-5, pp. 20-21). Plaintiff called Barnhill and told her the car needed to be turned in that evening. (Doc. 18-5, p. 21). Plaintiff testified that Barnhill told plaintiff she would turn the car in, but that plaintiff did not trust her. (Doc. 18-5, p. 21). Plaintiff also testified that he tried calling Barnhill to find out when she was going to turn the car in and left a message on her phone saying that she needed to turn the car in or else plaintiff would "go file it with the police." (Doc. 18-5, p. 15). Later in his deposition, plaintiff testified that Barnhill said she was not going to return the car. (Doc. 18-5, p. 29). Barnhill, in fact, did return the car that night. (Doc. 18-5, p. 30).

Before he knew that Barnhill had returned the car, on March 11, 2009, Plaintiff called the Sheriff's Office to file a complaint against her, and a deputy sheriff came out and met him. (Doc. 18-5, p. 25). Plaintiff told the deputy that Barnhill had taken the listed vehicle without his permission. (Doc. 18-5, p. 25). A warrant slip was issued to the plaintiff to swear out a warrant against Ms. Barnhill, but he never swore out a warrant against her because the vehicle had been turned in. (Doc. 18-5, p. 31).

According to plaintiff, later on in March 2009, when he received his bank statement, he discovered that his check number 1349 had been stolen and that his Mastercard had been stolen.

2

(Doc. 18-5, p. 15, Doc. 21-3, p. 55). On March 25, 2009, plaintiff went to Bay Bank to report that his check number 1349, written to Madonna Barnhill for $350.00, had been stolen and forged. (Doc. 21-3, pp. 55). The check for $350 was dated 2-29-09 and was cashed on 3-10-09. (Doc. 21-4, p. 17).

Plaintiff left Bay Bank and went to the Mobile County Sheriff's substation to file a report against Barnhill. (Doc. 21-3, p. 9). Deputy Blankinchip took plaintiff's report. (Doc. 18-4, p. 15). The defendant, James Lackey, was employed as a Sergeant with the Mobile County Sheriff's Office. (Doc. 18-4, p. 3). Sergeant Lackey came in the room and listened to the majority of the initial report and assisted with the taking of the report. (Doc. 18-4, p. 18). The report, which was dated March 25, 2009, at 1:20 p.m., included the following description of plaintiff's complaint:

> The complainant stated that a friend (Leslie Scheniel) brought the listed subject to his residence and introduced them on 03/09/2009. He stated after knowing the subject for a few hours she asked him to go and rent a hotel room. The complainant stated that he rented a room at the Bayfront Inn and Suites. He stated that after a while at the room the female left. The complainant stated he discovered that the listed check # 1349 was stolen out of his checkbook when he received his bank statement a few days ago. He further stated that he also discovered that the female took his Mastercard and used it several times without his permission. Case forwarded to white collar crimes detectives.

(Doc. 18-4, p. 48). Plaintiff's complaint was investigated that day by Lackey. (Doc. 18-4, p. 14).

Sergeant Lackey had worked other cases where Lesley Scheniel and Barnhill's names had come up as drug users and prostitutes. (Doc. 18-4, p. 20). Lackey was also aware that Barnhill had been arrested in the past for forging checks and stealing credit cards. (Doc. 21-4, pp. 13-14).

Plaintiff had made a previous complaint with the Sheriff's Office which Sergeant Lackey had assigned out to an investigator. (Doc. 18-4, p. 9). That case was closed as being unfounded. (Doc. 18-4, p. 9). In connection with that complaint the investigator reported to Sergeant Lackey that the matter appeared to be a civil dispute for which there were no criminal charges available, and that there were inconsistencies in the original report which led him to believe the case was not only unfounded, but was borderline insurance fraud on behalf of plaintiff. (Doc. 18-4, p. 10).

After investigating plaintiff's complaint concerning Barhnill, Sergeant Lackey arrested the plaintiff for false reporting to law enforcement, a violation of state law. After the arrest, Lackey wrote an "Investigative Narrative". (Doc. 18-4, p. 52-53). The Narrative stated:

> On 03-25-09, John Anthony Vukas came to the Theodore Oaks Substation to report a stolen forged check and the fraudulent use of a credit card. Vukas stated that a known female had stolen one of his personal checks and also his credit card. He advised that the check (#1349) had been written for $350.00, forged and presented by Madonna Barnhill at the Theodore Branch of Bay Bank on March 10, 2009. He provided deputies with a copy of the check.
>
> He had also showed deputies a copy of his MasterCard statement showing several charges that he claimed were fraudulent. All of these charges were dated March 10, 2009. There was one charge that he admitted he had made. That charge was to Baymont Inn and Suites. It was dated March 11, 2009. It is my experience that hotels will charge the credit card the day of check out, not the day of check in.
>
> Vukas stated that he had known Madonna Barnhill only a few hours when this occurred. He stated that he had been introduced to Barnhill by a friend named Lesley Schaniel. Based on criminal investigations I had conducted in the past, I knew both Schaniel and Barnhill to be drug users and prostitutes. With this information, and knowing that the victim lives locally, but had a charge on his credit card for a local hotel, I asked him if Madonna Barnhill was with him at the motel. He advised that she was. I asked him if there was prostitution involved. He advised that there was not, but that it was a possibility. He also stated that he rented her a car that day. He stated that he did not give her any money and had never written her checks before.

4

I made contact with Madonna Barnhill by telephone. She stated that she was ashamed, but that she was a drug user and had known Vukas for "a while" and had used drugs with him and allowed him to pay for drugs. I asked her about the check for $350.00. She stated that he had given her that check. She stated that he wrote it out, signed it and gave it to her. She advised that she cashed it at Bay Bank. She also stated that he had given her a check approximately two weeks earlier and she cashed that check at the same time. I also asked her about the credit card. She stated that Vukas had given her the credit card to use. She stated that she purchased several things including gift cards that could be exchanged for illegal drugs. She stated that Vukas had spend "a lot" of money and was probably feeling bad about how much he spent. She stated that she would be willing to testify.

I again spoke with Vukas, and he again stated that he met Barnhill that day and had never given her any money. I asked him to complete a handwriting sample form that is provided by and used by the United States Secret Service. He complied. While he was completing the handwriting sample, I went to Bay Bank and spoke with Janet Frazier. I showed her a copy of an authorization to release information signed by Vukas. She provided me with a copy of check number 1379 made payable to Madonna Barnhill for $100.00. That check was dated March 10, 2009. The disputed check number (1349) was dated February 29, 1009. Janet Frazier stated that she had reviewed the checks and signatures and she believed that it was, in fact, Vukas' signature on the check.

I returned to the substation and compared the handwriting sample form with all available checks and signatures. Based on my experience and training, and the fact that all handwriting and signatures displayed similar characteristics, it is my belief that Vukas wrote and signed the check that he claimed was stolen and forged.

I spoke again with Vukas. When shown the check for $100,00 that he did not dispute, he admitted to writing that check, but again denied the check for $350.00. He was adamant that he had met Barnhill on March 10, 2009. The check that he claimed was stolen by Barnhill is dated February 29, 2009 and is substantially off in check number sequence. I again went to Bay Bank and spoke again with Janet Frazier. She researched check numbers around 1349. She advised me that check number 1348 was presented in December 2008 for payment, and check number 1350 was presented for payment in January 2009. Knowing that the check numbers just previous and just past the disputed check were in December and January, it is not possible that Barnhill could have stolen a check of Vukas did not know her until March 10.

Based on all available information, Vukas was arrested and charged with false reporting to law enforcement. His vehicle was towed from the substation.

5

> He had a dog in the vehicle that was tuned (sic) over to a friend of Vukas' at his request. Also located in the vehicle was a Smith & Wesson >38 revolver (Serial #79780). The revolver was taken for safekeeping and will be turned in to property. It was also determined that Vukas was in possession of a pistol permit issued by the Mobile County Sheriff's Office. That permit was taken and will be forwarded to Chief Oliver's office with a copy of this report. I will sign the warrant.
>
> Case closed. One arrest.

(Doc. 18-4, pp. 52-53). Lackey testified to the same facts as reported in the investigative report.

Lackey testified that he, Corporal Miller, and Janet Frazier at Bay Bank all looked at the signatures and all believed that the signatures were the same. (Doc. 18-4, p. 22).

Officer Lackey called the assistant district attorney and discussed the details of the investigation, including Barnhill's version of the events. (Doc. 21-4, pp. 19-20). Lackey stated that he had corroborated Barnhill's story – such as the fact that plaintiff had written her a check previously that she had cashed that same day. (Doc. 21-4, p. 21).

Lackey testified that the plaintiff's check numbers were out of sequence - jumping from 1305 and 1306 to 1350. (Doc. 21-4, pp. 24-25). There were two checks in January, numbers 1309 and 1348. (Doc. 21-4, p. 26). The numbers could be explained by plaintiff having written checks from more than one check book. (Doc. 21-4, pp. 25-26).

Officer Lackey arrested plaintiff without a warrant. (Doc. 18-4, p. 17). Lackey arrested plaintiff based on the investigation and the conclusions that Lackey and other people drew. (Doc. 18-4, p. 17). At his deposition, Lackey stated that the sequence of the checks, the $100 check, the similarity of the signatures, and the prior case in which it was concluded that plaintiff's claim was unfounded, along with the fact that he had to pull information out of

6

plaintiff and that he was not forthcoming initially, made Lackey believe that there was probable cause to arrest plaintiff. (Doc. 18-4, p. 21, Doc. 21-2, pp. 29-30).

The charge against plaintiff was dismissed by the district attorney upon the condition that any further criminal complaints by plaintiff would go through plaintiff's attorney and that plaintiff would make available to the Mobile County Sheriff's Office his drug tests upon request. (Doc. 18-5, pp. 36-37).

## **DISCUSSION**

### **A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party

may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Plaintiff's Claim**

Plaintiff's complaint asserts one count against Lackey under 42 U.S. C. § 1983. (Doc. 1). The complaint alleges that Lackey, acting under the color of state law, violated plaintiff's Fourth Amendment rights by wrongfully arresting plaintiff without a warrant when no probable cause existed to support the arrest. The complaint does not state whether the action is brought against Lackey in his official or individual capacity.

When an officer is sued under § 1983 in his official capacity, the suit is simply "another way of pleading an action against an entity of which an officer is an agent." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (quoting Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105 , 87 L.Ed.2d 114 (1985)(internal quotations omitted)).

> Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents. See [Kentucky,] 473 U.S. at 165-66, 105 S.Ct. at 3105; Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985); Monell [v. Dept. of Social Services of City of New York], 436 U.S. [658] at 691 [(U.S.N.Y. 1978)], 98 S.Ct. [2018] at 2036 [(1978)]; Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir.1990). Consequently, a plaintiff cannot rely on a respondeat superior theory to hold a municipality liable for individual actions of its officers. Monell, 436 U.S. at 691, 98 S.Ct. at 2036; Hearn v. City of Gainesville, 688 F.2d 1328, 1334 (11th Cir.1982). "[A] municipality cannot be held liable solely because it employs a tortfeasor." Monell, 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis in original). Instead, in order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or harassment occurred pursuant

9

> to a custom or policy of the municipality. Id. at 694, 98 S.Ct. at 2037; Gilmere v. City of Atlanta, 774 F.2d 1495, 1503 (11th Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); Hearn, 688 F.2d at 1334.
>
> Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond). See Kentucky v. Graham, 473 U.S. at 166, 105 S.Ct. at 3105; Brandon v. Holt, 469 U.S. at 471-72, 105 S.Ct. at 877-78. ...

Busby, 931 F.2d at 776. Plaintiff has not asserted a claim directly against the City and has not alleged that a custom or policy of the municipality caused his injury. Moreover, defendant has asserted that, to the extent plaintiff asserts a claim against him in his official capacity, he is entitled to Eleventh Amendment immunity, citing Carr v. City of Florence, 916 F.2d 1521, 1527 (11th Cir. 1990). In his response, plaintiff offers nothing to support a claim against Lackey in his official capacity. Accordingly, the court finds that summary judgment should be granted to the extent plaintiff has asserted a claim against Lackey in his official capacity.

To the extent plaintiff's claim against Lackey is brought against him in his individual capacity, Lackey asserts that he is entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

10

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Here, it is clear that Sergeant Lackey was acting within his discretionary authority in investigating the complaint and arresting plaintiff because his actions were of the type that fell within his job responsibilities.[1] Plaintiff does not dispute that Lackey was acting within his discretionary authority. (Doc. 21, p. 7).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. An analysis of whether qualified immunity is appropriate must begin with the threshold determination of whether, based upon the facts taken in the light most favorable to the party asserting the injury, the officer's conduct violates a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508 (2002). If no constitutional right was violated, the court need not inquire further. Id. If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established. Id.

Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures." In Fourth Amendment terminology, an arrest is a seizure of the person,

---

[1] The court notes that the Eleventh Circuit has abandoned the dichotomy between discretionary and ministerial in the qualified immunity context. Holloman ex rel Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). The term discretionary authority includes "actions that do not necessarily involve an element of choice." McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995). The actions are discretionary if "they are of a type that fell within the employee's job responsibilities." Holloman, 370 F.3d at 1265. In assessing whether an official was engaged in a discretionary function, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id.

California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and the "reasonableness" of an arrest is determined by the presence or absence of probable cause for the arrest. The existence of probable cause at the time of arrest constitutes an absolute bar to a § 1983 action for false arrest. Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quotation marks omitted). This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances. See Maryland v. Pringle, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). An officer is not automatically liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause. As the Supreme Court observed in Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable." Thus, even if the court determines that the officers did not in fact have probable cause, the standard to be applied is that of "[a]rguable probable cause," that is, whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] could have believed that probable cause existed to arrest." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (quoting Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001)). This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists.

Even if any of the claimed conduct violated plaintiff's constitutional rights, defendants are still entitled to qualified immunity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396 (1982). The right was "clearly established," if at the time of the incident, the "pre-existing law...dictate[s], that is, truly compel[s]...the conclusion for every like-situated reasonable government agent that what defendant [was] doing violate[d] federal law in the circumstances." Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994). The plaintiff may not discharge his burden "by referring to general rules and to the violation of abstract 'rights'." Id. at 1150. Qualified immunity is evaluated on the basis of what the official knew at the time of the challenged action, not "by hindsight, based on later events." Id. at 1150.

Plaintiff asserts that his arrest was unlawful because ALA. CODE § 15-10-3 provides the circumstances when an officer may arrest a person without a warrant and that statute does not allow for an arrest when a misdemeanor has been committed. However, as defendant points out, the statute does allow for a warrantless arrest "[i]f a public offense has been committed … in the presence of the officer." ALA CODE § 15-10-3(a)(1). An officer may make a warrantless arrest if a misdemeanor occurs in his presence. Hawkins v. State, 585 So.2d 154 (Ala. 1991) (Finding warrantless arrest proper where arrestee committed the misdemeanor of giving false information to a police officer). Therefore, plaintiff's arrest does not violate § 15-10-3.

Although not violative of § 15-10-3, the issue remains – was the arrest reasonable? Sergeant Lackey believed he had probable cause to arrest plaintiff based on the investigation conducted that day. Lackey reports that he came to the conclusion that there was probable cause based on (1) the sequence of the checks, (2) the prior check to Barnhill for $100, (3) the similarity

13

of the signatures as judged by himself, Deputy Blankenchip, and Janet Frazier, (4) the fact that plaintiff had been found in a prior case to have asserted an unfounded complaint, (5) the fact that Vukas was not forthcoming.

Plaintiff asserts that Barnhill's version of the events should not have been relied upon because she had been known to forge checks and steal credit cards in the past. However, Barnhill's account was not even one of the reasons Lackey lists as the basis for his conclusion that plaintiff had filed a false report. Barnhill's account led Lackey to investigate whether plaintiff had written a prior check to Barnhill, as Barnhill reported. Upon checking, Lackey found that Barnhill was correct, that plaintiff had written a prior check to Barnhill. A check which plaintiff failed to mention and which, according to Lackey, plaintiff initially denied having written. Additionally, Lackey also knew that plaintiff had previously been found by one of the detectives to have filed an unfounded complaint. Thus, it was no less reasonable for plaintiff to believe Barnhill's story, than it was to believe plaintiff's story, based solely on their prior history of behavior. It clearly would not have been reasonable for Lackey to base his conclusion entirely on Barnhill's story, especially given her history of drug related problems and past arrests. However, Lackey did not reach his conclusion based only on Barnhill's account of the events.

Plaintiff also attacks Lackey's conclusion that the sequence of the checks indicated plaintiff had written the check earlier in the year, although plaintiff reported that he had met Barnhill the day the check was written – on March 10, 2009. Plaintiff asserts that all of plaintiff's checks were out of order and, thus, the fact that the check at issue was out of order showed nothing. Plaintiff is correct that the sequence of the checks is not proof of when they were written. Nevertheless, it is one factor that Lackey, or any officer in his place, might reasonably consider.

14

Plaintiff also attacks the signature comparisons because Lackey, Blankenchip, and Frazier are not handwriting experts. If the charges against plaintiff had gone to trial, it would have been important to obtain the opinion of an expert on the signatures for the purposes of trial. However, when an officer believes a person may have just committed a misdemeanor in his presence, requiring an expert opinion before arresting the suspect is not always reasonable. The officers and Frazier had extensive experience comparing signatures during the course of their jobs. Although their comparisons clearly were not proof positive that the signatures were the same, it was reasonable for Lackey to consider that, at least in their experienced eyes, the signatures appeared the same.

Lackey called and spoke to an assistant district attorney and considered all of the facts and circumstances before deciding to arrest plaintiff. None of the factors considered by themselves would have been sufficient to support probable cause. However, given plaintiff's outlandish story and the information Lackey uncovered when he attempted to investigate the matter, the court finds it was reasonable for Lackey to believe he had probable cause to arrest. Plaintiff's story was that he gave a check for $100 to a woman he had just met, then rented her a car and paid for a hotel room for her. Yet, plaintiff denied receiving anything in return. Any officer who knew that plaintiff had previously filed an unfounded police report would be reasonable in believing that the complaint was not credible. After investigating and hearing a different, more plausible account from Barnhill, and determining that the signature on the check at issue appeared to match plaintiff's signature and that the check number indicated it may have been written long before plaintiff claims to have met Barnhill, the court finds it that Lackey had, at least, arguable probable cause to arrest plaintiff.

Reasonable officers in the same circumstances and possessing the same knowledge as did Lackey could have believed that probable cause existed to arrest plaintiff.

Additionally, the court finds the Lackey's conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. Therefore, the court finds that Sergeant Lackey is entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (Doc. 18) is **GRANTED**.

**DONE and ORDERED** this 6th day of August, 2010.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE